UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-CR-20602-MIDDLEBROOKS

UNITED STATES OF AMERICA,

 Plaintiff,

vs.

WILTER BLANCO-RUIZ,

 Defendant,
_____/

DEFENDANT WILTER BLANCO-RUIZ' RESPONSE TO THE PRESENTENCE
INVESTIGATION REPORT
and
REQUEST FOR AN ALTERNATIVE SENTENCE

  The defendant, Wilter Blanco-Ruiz, by and through his undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), ((2) and (f), and the Fifth and Sixth Amendments to the United States Constitution, respectfully files his Response to the Presentence Investigation Report (PSR) and Request for an Alternative Sentence and as grounds therefore, states as follows:

### I. INTRODUCTION:

  Wilter Blanco-Ruiz is a 40-year-old first-time offender and a native of Palacios, Gracias a Dios, Honduras. He only completed 10th grade and subsequently obtained a Certificate in Auto-Mechanics from a trade school in Honduras. He is married to Dunia Melgar with whom he has 3 daughters, Dania, age 18, Saira, age 14 and Diana, age 11. Mr. Blanco also has 3 children from other relationships, Briana, age 10, David, age 9 and Sebastian, age 7. Prior to his arrest, Mr.

Blanco was involved in the support and rearing of all of his children. Mr. Blanco-Ruiz resided in Honduras for all of his life until the summer of 2016. Mr. Blanco Ruiz, together with the undersigned met with U.S. Authorities in 2015 to explore the terms of his surrender but due to the malicious interference of an informant who was purportedly counseling Mr. Blanco-Ruiz and managed to steal $600,000.00 from Mr. Blanco Ruiz, Mr. Blanco-Ruiz was spooked and even the undersigned lost contact with him until Mr. Blanco-Ruiz was arrested in Costa Rica on November 22, 2016. Mr. Blanco-Ruiz was extradited to the United States on March 15th, 2017. Mr. Blanco Ruiz has never lived in the United States. Mr. Blanco-Ruiz plead guilty to the Indictment on May 31, 2017.

Among the many sentencing factors contained within 18 USC § 3553, this Court will be asked to consider *Pepper v. United States*, 131 S. Ct. 1229 (2011), in which the court addressed the importance of considering events that transpire between the criminal conduct and the sentence in the punishment decision. By way of this filing, this Court will be asked to consider the nature and circumstances of the offense, the history and characteristics of Wilter Blanco-Ruiz, as well as the remaining sentencing factors of 18 USC § 3553, in fashioning a sentence below the *advisory* guideline range.

Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007, and Amendment 741 of the Sentencing Guidelines, effective November 1, 2010.) First, the Court is to determine the *advisory* guideline range. Pursuant to the written Plea Agreement, the parties agree that the applicable guideline is § 2D1.1, the base offense level is 38, and that Mr. Blanco-Ruiz is entitled to a 3-level reduction for his complete and timely acceptance of responsibility. The Parties also agreed pursuant to Paragraph 7(b) that the defendant's role in the offense pursuant to USSG Section

3B1.1(a) is that of a leader or organizer in a conspiracy that ultimately involved 5 or more participants. Although the PSR is consistent with the written Plea Agreement in that regard, the defense does not agree with a 4 level enhancement but would argue that this defendant's role in the conspiracy subjected him to the authority and decision of others and that he did not share in the profits of the organization to the extent that others in the hierarchy did, so the proper calculation should consist of a three level enhancement rather than a four level enhancement. Consequently, the proper Total Offense Level should be Level 38.

Second, the Court is to consider if there are any factors that may warrant a departure from the *advisory* guideline range. As before *U.S. v. Booker,* 543 U.S. 220 (2005), the court is to depart when it is warranted under the facts and circumstances of a particular case. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered," *U.S. v. Jordi,* 418 F. 3d 1212, 1215 (11th Cir. 2005). The PSR has failed to identify factors, specifically the effect of incarcerating a removable alien such as Mr. Blanco-Ruiz that may warrant a downward departure from the *advisory* guideline range. Notwithstanding sections of Chapter 5 guideline departures, Mr. Blanco-Ruiz, through counsel, will ask this Court to consider them as sentencing factors under 18 USC § 3553(a).

Lastly, the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is "reasonable" and not greater than necessary to achieve the sentencing objectives set forth in 18 USC § 3553(a).  As set forth more fully below, Mr. Blanco-Ruiz, through counsel, believes there are factors worthy of this Court's consideration.

**II.  SENTENCING SUBMISSION AND REQUEST FOR ALTERNATIVE SENTENCE:**

Wilter Blanco-Ruiz pled guilty to a conspiracy to import five or more kilograms of cocaine into the United States, in violation of 21 USC § 963.  The PSR recommends a total offense level 39 and, as a first-time offender, an *advisory* guideline range of 262-327 months.[1] The defense objects to the guideline calculations and submits the total offense level should be 38 with an *advisory* guideline range of 235-293 months. No Chapter Five downward departures have been offered.

Notwithstanding the above, this Court is fully aware the guidelines have been *advisory* since 2005, *U.S. v. Booker,* 543 U.S. 220 (2005), followed by *Gall v. United States,* 128 S. Ct. 586, and *Kimbrough v. United States,* 128 S. Ct. 558, both decided on December 10, 2007.  *United States v. McBride*, 511 F. 3D 1293 (11TH Cir. 2007), made clear that district courts are only required to give "some weight" to the *advisory* guidelines, as they are to the other 18 USC § 3553 factors.  To that end, Wilter Blanco-Ruiz, through counsel, offers the following:

**Nature and Circumstances of Offense, 18 USC § 3553(a)(1):**

**1.  Offense Conduct section of PSR:**  According to paragraphs 7 through 10 of the PSR, between January and February 2015, Mr. Blanco-Ruiz and others conspired to move 1800 kilos of cocaine from Colombia to Honduras, re-sold in Honduras and ultimately sent by other co-conspirators to Guatemala, Mexico and finally to the United States.

---

[1] According to the Sentencing Commission's "Sourcebook," Table 23, 95% of 71,003 federal cases sentenced in fiscal year 2015 faced *advisory* guideline ranges below 210 to 262 months.

4

**2. Speedy Resolution of Criminal Liability:** Mr. Blanco-Ruiz was arrested in Costa Rica on November 22, 2016. Immediately, he agreed to be extradited directly to the United States, did not attempt to thwart the extradition process and declined to be extradited to Honduras prior to being extradited to the United States. He requested an expedited extradition to the United States to face the charges in this case. His initial appearance was on March 16th, 20017, and he pled guilty 10 weeks later. Mr. Blanco-Ruiz has done all he could do, to quickly resolve his criminal liability in this case.

**3. Mr. Blanco-Ruiz' Pretrial confinement in Costa Rica Under Harsh Conditions:** Pursuant to a Provisional Arrest Warrant of the United States Government, Wilter Blanco-Ruiz was arrested by DEA and Costa Rican authorities on November 22nd, 2016. He was incarcerated for almost 4 months in Costa Rica at a notoriously cruel prison named La Reforma Maxima Prision where he was even bitten by a rat. On March 15th, 2016, he was extradited to the United States.

The prison in Costa Rica, where Mr. Blanco-Ruiz was housed, is a prison where inmates are housed in cells made of concrete, with freezing air conditioned temperatures and extremely bright fluorescent lights which are on 24 hours a day, every day. The inmates are only provided with a thin blanket to cover themselves. The scant amount of nutritionally deficient food provided is of extremely inferior quality. La Reforma Maxima Prision does not provide hot water to the inmates and on many days there is no water at all. The harsh conditions of the defendant's pretrial confinement while at La Reforma Maxima Prision warrant at the very least, a one-level downward departure under § 5K2.0 of the guidelines.

Of further note, the Eleventh Circuit has ruled that "conditions of pre-sentence confinement could, in an appropriate case, support a downward departure...." *United States v. Pressley*, 345 F. 3d 1205 (11th Cir. 2003; relying on *United States v. Carty*, 264 F. 3d 191, 196 (2nd Cir. 2001) (defendant's pre-sentence confinement in the Dominican Republic where conditions were bad may be permissible grounds for a downward departure), the Eleventh Circuit specifically ruled,

> The district court was correct in holding that conditions of confinement could provide a basis for departure, since this factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take a case out of the heartland of the applicable guidelines.

**The History and Characteristics of the Defendant, 18 USC § 3553(a)(1):**

**1. Wilter Blanco-Ruiz' Personal and Family History:** Wilter Blanco Ruiz is a 40 year-old Honduran native who has never lived in the United States. He is the son of Pedro Blanco, age 63 and Maria Ruiz, age 57., the brother of Lidia, Dora, Pedro, Telma, Corina, Maicol and Vanesa. He is the father of Dania, Saira, Diana, Briana, David and Sebastian. Mr. Blanco-Ruizuez has no history of prior arrests.

Mr. Blanco-Ruiz was born and raised in Palacios, a city and municipality in the Department of Gracias a Dios, Honduras. The area is known for cattle raising and Mr. Blanco-Ruiz' father continues to own and operate a small cattle ranch in the area. During his formative years, his mother remained home caring for the children, socioeconomic conditions were below average so Mr. Blanco-Ruiz began to go out to sea at the age of 10 to work with his father, who at that time was a commercial fisherman, for 3 weeks at a time during his summer vacations. His work days began at

4:00 a.m. and ended at 9:00 p.m. During the school year he worked on the farm and repaired his father's fishing gear. He never completed high school and instead went to a technical school and obtained an auto-mechanic's license. At age 20, he was recruited by his cousin Mario Rivera to work on a go-fast boat which would carry 20 kilos of cocaine at a time between Palacios to Puerto Lempira and Francia, in Honduras. He was paid $1,000.00 U.S. Dollars per trip. At that time, a kilo of cocaine sold in Honduras for $1,200.00 U.S. Dollars. He subsequently met someone from Panama who recruited him to go to Nicaragua to buy kilos of cocaine which regularly washed ashore near Puerto Cabeza, Nicaragua and bring them back to Honduras to sell to a trafficker known as Don Tito.

As time went by, Mr. Blanco-Ruiz became more involved and subcontracted with the owners of air strips in Honduras to receive small airplanes with cocaine from Colombian traffickers for re-sale in Honduras which ultimately made its way to Guatemala, Mexico and ultimately into the United States. Once the airstrip owner was paid for the use of the airstrip and the payments made to have the cocaine transported to the delivery point, Mr. Blanco-Ruiz realized less than 4% of the value of the contraband.

### 2. Consequences of Mr. Blanco-Ruiz' Alien Status

**(A) Mr. Blanco-Ruiz will experience a longer jail term than ordered:** Mr. Blanco-Ruiz is aware his immigration status will not allow him to benefit from an early release to a community corrections facility. (see 18 USC § 3624). Rather, he may serve a longer jail term than ordered by the Court as a result of the collateral consequences of separate DHS deportation proceedings, which will only commence once he is transferred from the BOP to ICE custody. Moreover, the conditions of confinement at the ICE deportation facility are poor. See *U.S. v. Ortiz*, 2007 WL 4208802 (D.N.J.)

(The court varied from the Guidelines based on the horrible prison conditions where the defendant was being held. The court had previously heard testimony regarding the conditions of the prison and granted a variance.) Mr. Blanco-Ruiz was aware of all this when he sought an expedited extradition, declined extradition to Honduras instead of the United States, and when he accepted responsibility and pled guilty in this case.

Finally, if Mr. Blanco-Ruiz is deported to his home nation, he may well be murdered shortly thereafter in retaliation for what the Honduran press has erroneously and recklessly alleged as his cooperation, including naming murderous traffickers that Mr. Blanco-Ruiz does not even know. Ironically, the Plea Agreement in this case does not contain cooperation language but the irresponsible and reckless Honduran Press has alleged that Mr. Blanco-Ruiz is cooperating with the United States Government. Likewise, his parents, his siblings, and his children are in danger and must continue to live in fear of retribution.

**(B) Bureau of Prisons Visiting Issues Unique to Mr. Blanco-Ruiz:** The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, Mr. Blanco-Ruiz is a removable alien and while incarcerated, he will not be designated to a minimum security camp, and he might very well be designated to a BOP privately contracted facility far from his family. None of these facilities currently operate in Florida, one of the closest states to, and perhaps most accessible to Mr. Blanco-Ruiz' family and children who all remain in Honduras. In any event, Mr. Blanco-Ruiz' continued

incarceration in the United States will make visits from his family members very difficult, expensive and they will be few and far between.

**Additional Sentencing Factors, 18 USC § 3553(a)(2):**

**1. Sentence to Reflect Seriousness of Offense, Promote Respect for Law, and Provide Just Punishment, 18 USC § 3553(a)(2)(B):** Long ago, prior to considering ameliorative punishment for cooperators, Congress suggested the largest drug dealers should face a 10-year mandatory minimum sentence. Congress, reflecting the community sense, felt that 10-years imprisonment adequately reflected both the seriousness of such crimes and would promote respect for the law. There is no evidence they considered such sentences for Honduran nationals and citizen violators, but this may be an appropriate sentencing consideration. In recent years, the Sentencing Commission suggested many of its past sentencing practices were too severe and amendments to the drug guidelines in § 2D1.1 were made both in 2011 (amendment 750) and 2014 (amendment 782). Just prior to those amendments, the Sentencing Commission's 2011 Report to Congress on Mandatory Minimum sentencing practices provide the following useful summary: [2]

> Floor statements delivered by members in support of the 1986 Act and a committee report on a predecessor bill suggest that Congress intended to create a two-tiered penalty structure for discrete categories

---

[2] U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 24 (2011) ["Mandatory Minimum Report"] quoting 132 Cong. Rec. 27, 193-94 (September 30, 1986); H. Diaz R. Rep. No. 99-845, pt. 1, at 11-12 (1986)). Cited with more detailed explanation in 2013 WL 322243 at *4.

of drug traffickers. Specifically, Congress intended to link the five-year mandatory minimum penalties to what some called "serious" traffickers and the ten-year mandatory minimum penalties to "major" traffickers.......

Senator Robert Byrd, then the Senate Minority Leader, summarized the intent behind the legislation:

For the kingpin - the masterminds who are really running the operations...we require a jail term upon conviction. If it is their first conviction, the minimum term is ten years...Our proposal would also provide mandatory minimum sentences as well. Those criminals would also serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail - a minimum of 5 years for the first offense.

The general problem is that Congress never intended the severe penalties of today but the Sentencing Commission tied enhancements and adjustments to a far too high starting point.

*United States v. Diaz*, 2013 WL 322243, *4 (E.D.N.Y.)

Consequently, a starting point in the 180 month range, meets the need for a sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.[3]

**The Need for General Deterrence and the Need to Protect the Public From Further Crimes of the Defendant, 18 USC § 3553(a)(2)(C):**  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels...reached that conclusion as has every major survey of the evidence."  Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be far better deterrent than its severity.").

By the time Mr. Blanco-Ruiz is sentenced by this Court, he will have been in continuous custody for more than 9 months, including the first four months at the cruel La Reforma Maxima Prision prison in Costa Rica.  He has spent over a year away from his family.  He has worried, not only for what his own future will bring, but also the safety of his loved ones in Honduras as a result of the what the reckless Honduran Press has alleged as to his cooperation.  Indeed, Mr. Blanco-Ruiz' acceptance of responsibility, his timely his guilty plea and his request for a 180-month sentence indicate to this Court that there will be very little need to protect society from any future wrongdoing.  Mr. Blanco-Ruiz is aware he will serve the functional equivalent of a Life sentence, beyond any additional sentence this Court may impose, since he will remain a pariah in his native country for the rest of his life.

**The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or other Correctional Treatment in the most Effective Manner, 18 USC § 3553(a)(2)(D):** A number of courts utilize the provisions of this section to focus on the rehabilitative ideal inherent in the punishment process. *Pepper*, 131 S. Ct. At 1242-1243, focuses on this criterion. To that end, Mr. Blanco-Ruiz is extremely remorseful for his misconduct. Mr. Blanco-Ruiz (1) has a supportive family anxiously awaiting his return; (2) he has acknowledged his guilt; and (3) he has expressed profound remorse in multiple tangible ways. While this Court has the duty to consider the need for "treatment," the amount of prison time petitioned for by Mr. Blanco-Ruiz should be *reasonable and not greater than necessary*. Rehabilitation has already occurred and will certainly occur within the next few years.

**The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct, 18 USC § 3553(a)(6):** According to the Offense Conduct section of the PSR, Mr. Blanco-Ruiz' involvement in the offense was not inconsequential because the offense involved the attempted importation of a large amount of cocaine. Mr. Blanco-Ruiz acted as a sort of middleman in the overall scheme of things. Another cog in the machine, if you will. The following cases are offered for this Court's consideration. It is believed these defendants were also involved in large scale drug trafficking, they were extradited primarily from Colombia, and they cooperated with U.S. agents. They received enhancements for their roles in the drug trafficking organization.

**1.** *United States v. Juan Carlos Sierra Ramirez*, *aka El Tuso*; Case # 02 CR 388, DC Cir. A former commander of the AUC and a major drug trafficker, he was sentenced to time served.

**2.** *United States v. Hugo Rojas Yepes*; Case # 04 CR 465, DC Cir. This major drug trafficker who was a large scale importer, was extradited in February of 2007 and sentenced January 2012 to time served.

**3.** *United States v. Roque Garcia Pedrozo aka Santiago*; Case # 09 CR 94, SDNY. This is a Colombian law enforcement officer who agreed to sell information to drug traffickers and others. He voluntarily surrendered, pled guilty, and cooperated. He was sentenced to time served (31 months).

**4.** *United States v. Carlos Fernando Serraldo*; Case # 03 1188, SDNY. This defendant was a commander of AUC as well as responsible for distributing tons of cocaine. He was extradited from Colombia in November 2011 and, in July 2012, he was sentenced to 56 months.

**5**. *United States v. Juan Carlos Ruiz Rivera*, Case # 12-CR-20206- Seitz. Mr. Rivera is a defendant sentenced in the SDFL by Judge Patricia Seitz to 197 months. The factual proffer in Mr. Rivera's case explains that he "invested in at least twenty-five cocaine shipments during the course of the conspiracy, ranging from 650-2000 kilograms each. Many of these loads were 1500 kilograms each." (DE 33); The Defendant actually had two Indictments. This case was the subject of a rule twenty motion transferring jurisdiction form the Middle District of Florida to SDFL. The factual proffer in that case details that Mr. Rivera's drug trafficking organization was responsible for the importation of over 100 tons of cocaine. (DE 16) The proffer additionally states that many multi-ton loads were actually seized in the case. Id. Multiple media outlets refer to this defendant as a drug king-pin and former hit man for the North Valle Cartel. Mr. Rivera's mammoth drug trafficking quantities are without comparison to the Defendant's actions and role in this case. Mr. Rivera's original guidelines range was thirty-eight plus four for leadership and no further enhancements. His opening guideline range was a level thirty-nine after acceptance of responsibility. A severe sentencing disparity would occur if the proposed sentencing guidelines enhancements and resulting computation were applied to this Defendant vis-a-vis Mr. Rivera.

**Latest Sentencing Statistics:**   The United States Sentencing Commission's "Sourcebook" of Federal Sentencing Statistics for fiscal year 2015 provides statistics for 71,003 cases sentenced that year.  Specifically, as to 255 cases sentenced in the District of Columbia last year, 67 % received sentences below the *advisory* guideline range; 40.4% which were Government sponsored, most involving substantial assistance motions, and 26.7%, because of downward departures and/or the sentencing factors of 18 USC § 3553.  Nationally, the nature and circumstances of the offense and/or history and characteristics of the defendant were cited as reasons for a downward variance in 10,324 cases. Indeed, district courts continue to exercise discretion, post-*Booker*, and impose sentences below the *advisory* guideline range.

**Conclusion:**  Wilter Blanco-Ruiz appreciates the opportunity provided by this Court and the American Justice System to proclaim his remorse and his commitment to refrain from further illegal activity of any nature whatsoever.  He is repentant about his past and prayerful about his future.

The parsimony provision found in 18 USC § 3553(a) imposes a statutory cap on sentences, no matter what is recommended under the sentencing guidelines: the district court is required to impose the least severe sentence necessary to satisfy the four purposes of sentencing enumerated in the statute.  With that said, Wilter Blanco-Ruiz asks this Court to consider a sentence which will not continue to separate him from his loved ones any longer than is reasonably necessary.

Wilter Blanco-Ruiz and Counsel thank this Court for considering our Response to the PSR and Request for an Alternative Sentence.   Counsel will have further remarks at the time of sentencing.

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF Filing System on this 27th day of July 2017.

Respectfully Submitted,

LAW OFFICES OF VICTOR E. ROCHA, P.A.
990 Biscayne Blvd, Suite O-903
Miami, Florida 33132
Tel: (305) 774-9111
Fax: (305) 514-0987
Email: vicrocha@comcast.net

By: */s/ Victor E. Rocha*
    Victor E. Rocha, Esq.
    Fla Bar No.: 366382